May it please the Court, Mary Ann Dugan for Appellant Autotel. I would like to reserve 5 minutes for rebuttal. Watch the clock, you may. Thank you. There are two, as the Court knows, there are two primary issues in this case, main issues, which are whether the lower court erred in dismissing the good faith claim and whether the Court erred in dismissing the interim connection arrangement claim. If the Court has a preference, I will start with one or the other, but I will. You can be succinct on both, that would help. Thank you, Your Honors. On the good faith claim. You could answer one factual question for me. Yes. Autotel had an agreement arrangement with Nevada Bell, as I understand it, and that was for analog service? Yes, Your Honor. Autotel in late 2005, within two years of the complaint, requested digital and has never. And digital is wireless or? I think that's a different issue of how the connection occurs and how the transmission occurs. But I'm out of my technical depth on that. Do they both depend on landline? I know analog depends on landline, correct? Well, actually, you can get analog on a cell phone, so that's why it's a little bit. I'm embarrassed. I spent two years before law school working for Pacific Telephone. Oh, dear. You know, this technology has gone so far beyond number five crossbar in central offices. So I'm asking what seems like a stupid question. I don't think it's a stupid question. The only thing I know is that when my cell phone ran out of service in eastern Oregon, the radio shack told me it was because it was on analog. All right. Which I don't think, I am not qualified to answer your technical question, but. So do you know what it was that they needed to get from the analog to the digital status? Not in technical terms, Your Honor. All right. I won't take up your time then on that. Thank you. Thank you, Your Honor. On the good faith claim, the Nevada rules, as we cited in our opening brief at page 29, the primary requirement for pleading is that the person filing the complaint file a short and plain written statement showing the complainant is entitled to relief, very similar language to requirements for a Federal complaint. And the plaintiff certainly met that requirement, and that's at ER 42 through 45. And the PUC simply never explained why in any way this petition was inadequate. And we would submit, Your Honor, that it's blatantly in error on that. So, counsel, is it your argument that you, that your client was not required to adhere to the rules of the PUC, the filing requirements of the PUC? No, Your Honor. I mean, if there were additional requirements, excuse me, for a complaint to be processed, is it your position that those additional requirements were not enforceable against your client? Not at all, Your Honor. No such requirements were ever identified. The Court in this case, at ER 7 to 8, cited some provisions which are not relevant, and those are provisions for filing a petition for arbitration of an interconnection agreement. The provisions we cited at pages 29 to 30 of our brief are provisions for filing a complaint about the activities of a carrier, which is what this is about. And as we explained in those pages of the brief, Mr. Oberdorfer complied with those provisions. How did the PUC characterize your filing? As having procedural defects with no further explanation. There was one defect which Mr. Oberdorfer was able to pin down by talking on the phone with the PUC, as we explained in the brief, which was that he had to make a summary for publication, and he did submit that. So we would submit, Your Honors, that this case is similar to the Vaught case and the supply brief at pages 1 to 2, where this Court held that the agency had erroneously dismissed on procedural grounds, and therefore, the plaintiffs were deemed to have exhausted their remedies. However, I would submit that in this case, there is even clearer evidence that Mr. Oberdorfer and Otto have exhausted their remedies, because in this case, we are not dealing with the Administrative Procedures Act and specific exhaustion requirements in the statute, as the Court dealt with in Vaught and Ayers. Here we have prudential requirements, which were set forth by the Court in Western Radio v. Quest, and in that case, the Court provided no guidance, unfortunately, as to how someone is supposed to go about filing a claim for good-faith violation with the PUC. And there's no State provisions on that point, either. And so then, with that in mind, wouldn't you look to the provisions of the agency itself to tell the PUC processes numerous proceedings, usually without any problem, and there's a format that's on file in terms of how proceedings go through the PUC, what has to be filed, what allegations have to be made. I know this because when I was in the DA's office, we used to do them all the time. So there's a format that's there. Correct. And I don't understand why your client takes the view that he didn't know what he was supposed to do to get his complaint heard. That's hard for me to fathom. Well, he explicitly complied with the plain language of Nevada Code 704.680355A, which requires the short and plain written statement showing the complainant is entitled to relief. He also complied with the provision that requires that he show that the parties conferred. This is on ER 43. He also complied with the requirement that he list facts and relevant statutes. He did that at pages 42 through 44, and that he list the relief requested, which is 44 through 45, that he have a certificate of service, which is on page 46, and that he have a summary for publication. Those are all the provisions that I could locate, and none have been brought to the Court's attention by the defendant in addition to those requirements. Okay. By analogy, in the Rule 8 of the Federal Rules, it has the same thing. But the case law has fleshed out that there has to be more in a complaint now. So even though Rule 8 says that you put a short and plain statement of the facts entitling one to relief by interpretation from courts, including United States Supreme Court, we know now that that's not necessarily sufficient. So why could the PUC require more facts or something else just as courts do under Rule 8? PUC certainly could have done that. And in the Federal context, of course, we would have a motion by the defendant citing Iqbal and Twombly, explaining what exactly is wrong with the complaint. And then each party would have the opportunity to brief that issue, and there would be a hearing. In this case, the PUC summarily dismissed the complaint, stating there were procedural defects, did not identify what those defects were, and I have been able to locate no such defects. And there was no briefing on that issue by the defendant. So you're saying 703 and 704 don't lead you into procedural requirements that were clear enough? 703, sorry. I'm trying to remember what they cited. Is that what was cited by the court? Cited by the PUC. Failure to comply with. Oh, right. So then we go to 704, which is where we got the provisions I just listed. Yes. And there's nothing further that's explained in those provisions. It doesn't say you have to, you know, list exactly what date each thing happened or attach e-mails. You said something, forgive me for interrupting, but I'm following up on your statement earlier that they cited irrelevant sections that had to do with arbitration. Are you saying 703 and 704 absolutely don't apply to your client's filing at all? The court cited the provisions that relate to a petition for arbitration of an interconnection agreement, which are very specific. And that's a whole other process than what we were invoking here. What were you seeking? We were seeking a claim for damages for violation of the good faith provision, which, as this Court stated in Western Radio v. Quest, must first go to the PUC. Okay. Well, maybe you should turn to the second one. Did you or did you not have an existing interconnection agreement? Not. We did not have an existing interconnection arrangement, as that term is defined. That is a term of art. It was created by the FCC in 1996, as the Court explained at ER 15 in this case below. And the here, the interconnection provisions between the parties were established in 1994, as the defendant stated in his brief, its brief at 30. So that predated the creation of the concept of an interconnection arrangement sorry, an interim connection arrangement. I just want to make sure we're looking at the same language. I'm looking at the language that says when the requesting carrier does not have an existing interconnection arrangement that provides for the transport and termination of telecommunications traffic by the incumbent LAC. It's not just interconnection arrangement. It provides for. What did, what was the analog arrangement or agreement that AutoTel had with AT&T? AutoTel, like any retail customer would, called up AT&T and asked for five lines or five hunks. And so that provided for the transport and termination of telecommunication traffic by the incumbent LAC. Correct? That's correct, Your Honor. But the problem is that there is no definition in the statutes for interim connection arrangement. It is a term of art that was created by the FCC in 1996. I'm sorry. It says does not have an interim. It says only requires to have an interim interconnection when the requesting carrier does not have an existing, existing interconnection arrangement that I read. So I'm trying to understand why you're not, your AutoTel, is it within the exclusion? Because the FCC in creating this term of art explained and. Which is the term of art, counsel? Interim, interim connection arrangement. There was no such term before 1994. I understand. Before the FCC wrote that rule. Yes. There was no such thing. Okay. But whatever it is, it still says it does. Whatever it is, that term of art presupposes that AutoTel doesn't have an existing interconnection arrangement, which it sounds like it did. No, it had made arrangements with AT&T. Yes, that's true. The problem is that as the FCC explained, and this is in the defendant's brief at 31, the FCC was concerned that competing carriers would either have to choose the take it or leave it tariff provisions or not have any sort of reciprocal compensation while they were negotiating an actual interconnection agreement, an ICA, to go through the PUC. And so the FCC was not just concerned when they made these rules about making sure you had an arrangement and an interconnection, but making sure there was also rates that were symmetrical as the word they used in that statute, in that rule. And so they were taking a statute which doesn't talk about interconnection, interim connection arrangements, and they created a new requirement two years after Western Radio began interconnecting with AT&T. And part of that requirement was that there be symmetrical compensation. Now, it just makes no sense. It goes against FCC's concerns and policy. It would make no sense to interpret this rule to grandfather in these prior connections that had no symmetrical compensation because that is an explicit part of that rule defining what an interim connection arrangement is. And so the rule is kind of circular. It says you get to have an interconnection arrangement if you don't already have an interim connection arrangement, but they don't cite back to something preexisting that defined what that means. And so the only definition of interim connection arrangement we have is in 51.715, which in Section B makes clear it has to have symmetrical compensation, which Autotel never had. Even if Autotel did have one, in 2005, that arrangement was voided and made illegal by the T-Mobile decision, which said that it was illegal to be charging these commercial mobile radio providers tariffs for interconnecting, that they had to be treated on the same, with the same reciprocity as the other types of carriers. And... Aren't those disputes supposed to be mediated by the Public Utilities Commission? The interim connection arrangement actually kicks in automatically as soon as the ILEC, the incumbent, requests interconnection, which so now it's a little convoluted, but here AT&T requested interconnection after the T-Mobile decision. That's in the record at ER 106. Once that happens, under 20.11, the interim transport and termination pricing described in 51.715 shall apply. 51.715 says upon request for interconnection, the incumbent shall provide the transport and termination immediately under an interim arrangement. In other words, it's an immediate rule that kicks in without any intervention by the PUC, without any need for AutoTel to make a request for that interim arrangement. And the interim arrangement requires symmetrical pricing, and that's in subsection B. Thank you, Your Honor. I'll give you a minute on rebuttal. Good morning. May it please the Court, Dennis Friedman for AT&T Nevada. And I guess I'll start with the issue that counsel finished up with. That's probably a good idea. Can you answer the question I asked factually, though? What is the difference between the analog and the digital connection that is at issue here? In other words, if they had an existing arrangement for analog service, what more — what had to happen to make it capable of a digital service? Well, I can answer the question, I think, that, Your Honor, in a different form. I think — it has nothing to do with whether it's wireless or not. Okay. I've got that. Digital basically means faster, more capacity. Would there be different lines? Would there be different lines? There would be different equipment. There would be different equipment. But having said that — Different equipment at the switching facility. As far as AT&T is concerned, the traffic runs through their — The facility — Central office, right? I have to be careful so that I don't get beyond my technical — I don't want you to, but — It's customers. And the AT&T switch would be a different facility. It would be a digital facility instead of an analog facility. It's still in the same building physically, but the equipment would be different within the — Well, or it's still running in the same place under the ground or in wires above ground. Because what AT&T controls, as I understand it, is the connection between the telephone subscriber and the switching equipment. Autotel wants to provide service to the telephone subscriber, but they can't get to the subscriber without going through AT&T's equipment. When Autotel interconnects with AT&T, what that means is that Autotel, in cooperation with AT&T, establishes a connection, a physical connection, between Autotel's network and AT&T's network. And it has to run through AT&T.  If it doesn't work, it hits an AT&T switch, and then it gets carried on to AT&T's customers. So it starts out within the Autotel system. At some point, it stops with Autotel, takes up with AT&T, and gets wherever it's going. Is that fair? I mean, I'm trying to put it in layman's terms. Now what you're getting into, really, is the nature of the facility, which is sometimes called the pipe, or an interconnection facility that connects the two. Right. And that is often, and I don't know what it would have been in this case, that is often a shared facility, because it carries traffic back and forth. It might be a facility that AT&T puts in place, but where the parties share the cost. There are all kinds of variations. Well, that wasn't the allegation that was made in this case. Well, no, that's right. And, in fact, I want to quickly say, with all respect, that I think that the answer to the question before the court, notwithstanding the allegations about, well, we had analog and we want digital, is a black-and-white issue, and it's just as simple, Judge Fischer, as you indicated, that the rule that Autotel contended in the district court, that AT&T violated, says, as Your Honor pointed out, upon request from a telecommunications carrier, without an existing interconnection arrangement with an incumbent LEC, the incumbent LEC shall provide interim interconnection. And then there's another part that says that that interim arrangement, the interim arrangement which must be provided if, but only if, there's a request and there's no existing arrangement. They must have symmetrical rates. What's underlying my factual question is the whole history of all of this telecommunications evolution is the monopolization case. And it was to give, provide competitive services to the ultimate user. And what I'm trying to understand under this existing interconnection arrangement language is if the FCC had in mind that if you already have a deal with AT&T, you're not a new entrant, you're now just going to add to the level of service, they could conceivably decide, okay, you have your abilities under your existing arrangement. What we want to deal with are the people who have no arrangements, and so we want these interim agreements in the meanwhile. So that's what I'm trying to get at. That is the case, and in fact, at page 31 of our brief, we quote from the FCC's discussion of exactly why it promulgated that rule. And what it said was, look, these carriers are going to come to AT&T and ask for interconnection agreements under the 96 Act. And under the scheme that Congress set up, it may take months to get an agreement in place, an interconnection agreement of the sort that Congress mandated in the 96 Act, because you have a period of negotiation. If you don't reach agreement, you can have an arbitration at the state commission and so forth. So the period from request for an interconnection agreement to really being in business can take some time. So the FCC said, look, if a carrier comes to AT&T and says, I want to negotiate an interconnection agreement with you, that carrier can also say, and meanwhile, while we're negotiating, I want an interim arrangement, and AT&T has to provide it, just to get the traffic flowing. And the FCC explained that the reason for that is no other. Let me just stop there. If the new person on the block wants a digital interim connection so that they can provide the faster digital service, are you saying that's what they would be entitled to get under this interim arrangement? The answer has to be yes. That's what they want, right? So if Autotel had no analog arrangement, they could have come to you and say, analog is kind of old school. We want the faster connections. So you've got to give us this interim arrangement, and then we'll work out, give us time to go through this other. But the posture they're in is, well, they had the fortune or misfortune of having an analog arrangement, and now they are what? Put in a position for them to compete in the digital market. They don't have any protection for making sure AT&T hustles along and doesn't give them a run around? It's an interesting question, Your Honor. I mean, the FCC's concern was to make sure that the newcomer could start up, could get going at some level. Sorry. I've never seen a case or encountered a situation that presented that question. Can a requesting carrier, without an existing arrangement, insist on digital interconnection? Certainly, I would think that if that was, I think that would raise the question, is that the norm? At the place where the requesting carrier wants to interconnect, does AT&T have the ability to provide digital interconnection? I think you would have that question. I don't think the answer to the question is an automatic yes. What do you deal with then with the symmetrical and T-Mobile argument? All that has to be symmetrical is the rates under an interim arrangement if one is required. In this case, there was no interim arrangement required because there was an existing arrangement. So we don't get to that question. What the FCC's rule says is under certain circumstances, the requesting carrier is entitled to an interim arrangement. That's A. And B says, and under that interim arrangement, rates shall be symmetrical. Symmetrical with what? With each other. What that means is that AT&T would pay AutoTel the same permanent rate when AutoTel terminates on its network a call that originates on AT&T's network. That would be the same rate as the rate that AutoTel would have to pay AT&T in the opposite situation. That's what's meant by symmetrical rates. But the important thing for present purposes, Your Honor, is that the existing arrangement, which you correctly pointed out, simply says all you have to be to be an existing arrangement under the FCC's rule, you have to have one characteristic. You have to be an existing interconnection arrangement that provides for the transport and termination of telecommunications traffic by the incumbent LEC. Did AutoTel have that? Yes, it did, by its own admission and deposition. I mean, this was undisputed, that there was an existing arrangement at all times that provided for transport and termination of telecommunications traffic by the incumbent LEC. If the FCC had wanted to, it could have said the ILEC, the incumbent AT&T, is excused from providing interim interconnection only if there is already in place an existing arrangement that provides for transport and termination at such and such a rate or at symmetrical rates. But it didn't say that. It just has an arrangement that allows the new guy on the block to start exchanging traffic. That was the FCC's concern. So did AutoTel have the ability to go before the PUC and challenge the continued existence of the interim arrangement if it wanted something different? Certainly. Your Honor, what AutoTel needed to do is what hundreds and hundreds of carriers around the country have done. AT&T incumbent local carriers are parties to thousands of interconnection agreements with hundreds of competing carriers, large and small. Many of them were negotiated. Many of them were arrived at through arbitrations in state commissions, subject then to federal court review. What all AutoTel needed to do, and in fact, it did it, but it just didn't do it right, was to try to ask AT&T to negotiate an interconnection agreement, negotiate, which the parties did, ask the Public Utilities Commission to arbitrate, which AutoTel did. The arbitration, there was an arbitration. It eventually fell apart. The Nevada Commission, in a decision that is not challenged here, dismissed AutoTel's petition for arbitration on the ground that AutoTel had flaunted the discovery orders of the administrative law judge and thereby engaged in bad faith. So all AutoTel had to do to get what it wanted is what hundreds of others have done, arbitrate an interconnection agreement. What about the complaint that AutoTel sought to file before the Public Utilities Commission? That is the complaint. That takes us to the other issue, the claim that AT&T failed to negotiate in good faith. And with all respect for the extensive dialogue we have here about whether the Nevada Commission did or did not properly enforce its own rules, that question I would submit is not properly before this court and was not properly before the district court. That is a question of state law. What AutoTel should have done, as you pointed out in our brief, when it got a rejection notice from the Public Utilities Commission of Nevada saying you didn't do it right, there were some things it could do internally, but if failing that, what does it do? It appeals to state court. Well, the district court addressed the point. So the district court having addressed the point, what's your response to the merits, on the merits? Well, the district court, if I may, actually said two things, and I must say they're not entirely consistent. On the one hand, the district court says in text, this was a half-hearted – it says something that does appear to address the merits. It says AutoTel didn't follow the rules. It made a half-hearted attempt and so forth. But then in a footnote, the district court says, AutoTel wants me to cut some slack for Mr. Oberdorfer because he was acting pro se. I'm not going to do that because this is not a case where the Public Utilities Commission's decision is being challenged or is on review. Again, I don't think it was an appropriate question for the district court, nor do I think it is here. On the merits, though, AutoTel concedes in its brief that if certificates of service were defective, that's in a footnote in AutoTel's brief, but it says, well, but really that shouldn't make any difference for various reasons. What about the content of the complaint itself? I think there's an interesting question about that, in that under the commission's rules, the complaint has to allege that the complainant conferred with the Respondent about the complaint that's being brought. In this case, that would mean, I think, that AutoTel would have had to certify that it had talked with AT&T about its contention that AT&T violated its duty to negotiate in good faith. In the complaints that AutoTel filed, it says we've had discussions, but in context, it appears that those discussions were about interconnection, not about good faith. But another point that I would add, Your Honor, if I may, is that in a case that properly presents the question, did the Nevada Commission follow its own rules, or did it violate its rules? When such a case is properly brought, whether it's in state court, or counsel for AutoTel suggests in federal court under Section 252e6 of the Telecom Act, the Nevada Commission would be here to explain. Okay? Section 252e6 is the section of the Telecom Act that says when a state commission makes a determination as an arbitrator, or in carrying out its responsibilities under the Telecom Act, an agreed party can bring in action in appropriate district court. When an agreed party does that, it names as defendants, to avoid 11th Amendment problems, the commissioners. And so if the case were properly presented, the commissioners would be here, or the commission would be here, to explain its decision. Judge Wright, do you have any questions? None at all. Thank you. Counsel? Thank you. You have a couple of minutes. Yes. Real briefly on that last point, as this Court noted in Western Radio vs. Quest, we have somewhat of an anomaly in requiring exhaustion between private parties, where the PUC is not a party to this action. The conferral issue was never argued in the brief. And as this Court stated in AT&T vs. Pacific Bell, it would not be appropriate to require a State appeal. There would be no jurisdiction in State court because it's a Federal claim. The AUTOTEL had no interim remedies here. Judge Fisher, you stated that, you know, basically that Western Radio, I'm sorry, AUTOTEL already had a deal. But they didn't, because they were being billed at the tariff rates. They had no negotiated deal on the rates. And that's the whole point of the T-Mobile case. In that case, the court, the FCC, excuse me, said that without interim relief, there is a dilemma that the carrier has. And I see that I'm out of time. If I may just sum up. You can finish your sentence. Thank you. There's a dilemma that the carrier has, that they have to either accept the take-it-or-leave-it tariff rates or hold off on interconnecting. And here, there was no true interconnection arrangement because there was no provision for symmetrical rates. Thank you, Your Honors. Okay. Thank you, counsel. Interesting, complicated case. Case is submitted.
judges: Fisher, Rawlinson, Cjj Wright (C. Cal.), Dj